OWINGS et al. v. PRIDEAUX. (No. 9399.)

(Court of Civil Appeals of Texas. Fort Worth. Nov. 13, 1920. Rehearing Denied Dec. 24, 1920.)

1. Mines and minerals ⬅➡78(1)—Contract, lease, and bond construed as not intending that if time for drilling well was extended by payment lessor could also recover on bond for failure to begin by fixed date.

Contract for a lease and for development of oil land, a bond for its performance, and the lease executed in connection therewith, construed as one whole contract, held to show parties intended payment to lessor of amount of bond as liquidated damages for breach by failure to drill a well, which should be begun on or before a fixed date, and that they did not intend that if the time to begin drilling was extended for one year by paying $1,000 therefor, as provided, lessor could also recover on the bond for failure to begin the well on or before the date fixed.

On Motion for Rehearing.

2. Mines and minerals ⬅➡78(1)—Whether defendant sued on bond for breach of drilling contract had any interest in oil lease held immaterial.

In action on bond for performance of oil drilling contract in connection with an oil and gas lease, held that, as to the liability of defendant and his sureties, it was immaterial whether defendant had any interest in the lease.

Error from District Court, Archer County; Wm. N. Bonner, Judge.

Suit by R. O. Prideaux against A. D. Owings and others. Judgment for plaintiff, and defendants bring error. Reversed and rendered.

Ocie Speer, of Fort Worth, for plaintiffs in error.

Miller & Miller, of Fort Worth, for defendant in error.

DUNKLIN, J. R. O. Prideaux entered into a contract with A. D. Owings by the terms of which he bound himself to execute an oil and gas lease in favor of Owings on 1,000 acres of land if Owings would execute to Prideaux within a stated period of time a bond in the sum of $5,000 to insure the performance of the obligation assumed by Owings. Thereafter the bond was executed by Owings in favor of Prideaux, who, in turn, executed the lease to Owings. This suit was instituted by Prideaux to recover on that bond against Owings and the sureties therein, and also to cancel the lease for alleged breach of contract with respect to drilling operations, suit for such cancellation being against Owings and the assignees of different portions of the lease. Judgment was rendered in plaintiff's favor for the amount of the bond, but denying plaintiff a cancellation of the lease, and Owings and the sureties upon the $5,000 bond have prosecuted this writ of error.

The alleged contract between the parties, the bond given by Owings, and the oil lease executed by Prideaux are as follows:

"Original Contract.

"The State of Texas, County of Tarrant:

"This contract made and entered into this 4th day of April, 1919, by and between Richard O. Prideaux, Sr., of Archer county, Texas, party of the first part, and A. D. Owings, of Bartlesville, Okl., party of the second part, witnesseth:

"(1) Party of the first part is the owner of

⬅➡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

approximately 7,000 acres of land situated in the southeast part of Archer county, Texas, and consisting of

T E & L surveys numbers 1863, 1864, 1867;

Eastern part of Samuel H. Smith survey;

Western part of the Jno. Walker survey;

Part of the Robert Crossman survey, abst. # 65;

The Conrad Bollinger survey;

I RR Co. survey numbers 1, 3, and 4;

The J. J. Hughes survey;

The A. McMullen survey; and

The N. E. quarter of survey No. 2 in the name of BBB & C RR Co., the south part of said McMullen survey is located in Young county, Texas.

"The party of the second part desires to develop a part of the land hereinabove described for oil and gas.

"(2) In consideration of the sum of $1.00, receipt whereof is acknowledged, and of the expenses and expenditures of party of the second part in deciding whether it will probably be profitable for him to undertake the development of a part of said land, parties of the first part hereby grants to party of the second part an option for ten days to contract for the developing of said land upon the following terms and conditions, to wit:

"(a) Upon the execution by party of the second part as principal with sureties satisfactory to party of the first part of a bond in the sum of five thousand ($5,000.00) dollars binding party of the second part to keep and perform each and every of the covenants in this contract contained, then party of the first part will execute upon the form known as Producers' Texas Form No. 88, as near as practicable, an oil and gas lease on 1,000 acres of the lands belonging to party of the first part which may be selected by party of the second part to Henry O. Prideaux, and the consideration of the said oil and gas lease shall be the performance of the terms and conditions of this contract binding upon party of the second part, and the terms of said lease shall be five years from its date, and as long thereafter as oil or gas, or either of them, is produced from said land by party of the second part or his assigns; and it shall bind party of the second part to pay royalties of one-eighth (⅛) of oil and gas developed on said land, and shall provide that party of the first part shall have gas free of cost from any well put down on said land for all stoves and inside lights in the principal dwelling houses on said land, and for pumping purposes during the term of said lease, by making his own connections with the wells at his own expense. The said lease shall provide that if no well be commenced on said land on or before July 1, 1919, the said lease shall terminate as to both parties unless on or before that date the lessee shall pay or tender to party of the first part, or to his credit, in the Power State Bank of Archer City, Texas, or its successors, which shall continue as the depository, the sum of $1,000, which shall operate as a rental and cover the privilege of deferring the commencement of a well for twelve months from said date, and that in like manner, and upon like payments or tenders, the commencement of a well may be further deferred for a like period of the same number of months suc-

cessively, and shall contain the further covenants usual to said Producers' Form No. 88.

"(b) Within ten days from this date party of the second part, or his agent or representative, shall select from the lands owned by party of the first part above mentioned 1,000 acres, which shall be in a solid body and in whole surveys as near as possible, and shall not be in a corner of the lands, and shall be approved by party of the first part; and thereupon the land so selected shall be described in the oil and gas lease to Henry O. Prideaux, which shall be executed by party of the first part, joined by his wife, Mrs. Sophia Prideaux. Immediately upon the selection of the 1,000 acres of land above mentioned by party of the second part, and approved by party of the first part, party of the second part shall select his location for drilling a well which shall not be in a corner of the lands selected by him.

"(c) On or before July 1, 1919, party of the second part or his assigns shall begin the drilling of a well for the development of oil and gas on the 1,000 acres of land belonging to party of the first part which may be so selected by party of the second part and approved by party of the first part, and in the drilling of said well party of the second part shall use cable tools with equipment sufficient to drill a well to the depth of 1,700 feet; and after the beginning of the drilling of said well, which shall be as above specified, not later than July 1, 1919, party of the second part shall continue the drilling of same with ordinary diligence until it is completed to a depth of 1,700 feet, unless before reaching said depth oil in amounts of fifty barrels per day shall be produced from said well, in which event it shall be deemed that the well has been completed the full contract depth, and thereupon party of the second part shall not be compelled to drill same deeper.

"(d) In case party of the second part shall fail to begin the drilling of such well as is provided for in paragraph (c) hereof on or before July 1, 1919, or shall fail to continue the drilling of such well until it is completed as provided in paragraph (c) hereof, then party of the second part and his sureties on the bond hereinabove mentioned shall pay to party of the first part the sum of $5,000 as liquidated damages, which the parties agree is reasonable compensation for such failure.

"(e) In case either two of the three wells now drilling, to wit, the Silk well, about five miles N. E. of the lands belonging to party of the first part; the Three States well, about two miles S. W. of the lands belonging to the party of the first part; the Cosden well, about ten miles S. E. of the said lands belonging to the party of the first part—should produce 200 barrels or more each day at a less depth than 3,000 feet, or should produce 400 barrels or more each between 3,000 feet and 4,000 feet, then the party of the second part agrees and binds himself to begin and continue, with ordinary diligence, drilling to the sand so producing such quantities of oil within one year from the time any two of the wells above mentioned shall come in, and in case he shall fail so to do then he shall forfeit this contract and all his rights hereunder and all his claim to any of the lands of party of the first part. It is

further agreed that the same conditions herein contained with reference to the three named wells shall apply to any two wells which may be hereafter sunk within three miles of the 1,000 acres of land which may be selected by party of the second part and approved by party of the first part.

"(f) In case party of the second part exercises the option herein granted within the time specified, and shall execute within the time fixed the bond above mentioned, then party of the first part binds himself to furnish to party of the second part as soon as possible abstracts of title brought down to date to the 1,000 acres of land which may be selected by party of the second part and approved by party of the first part, which shall show good title to the lands so selected in party of the first part, and thereupon party of the second part shall have ten days from the date of delivery of such abstracts within which to have same examined by some person of his selection, and, if upon such examination the title of said lands are not shown to be good in party of the first part, the objections of the examiner of them shall be communicated to him in writing, and party of the first part shall have a reasonable time, using ordinary diligence, within which to remove such defects, and, in case he is unable to do so, then this contract shall become null and void, and the bond which may be so executed by party of the second part with sureties shall be canceled and returned to him.

"Witness the hands of the parties hereto the day and date herein first above written.

"[Signed] R. O. Prideaux,
Party of the First Part.
"A. D. Owings, Party of the Second Part.

"Bond.

"The State of Texas, County of Tarrant:

"Know all men by these presents that we, A. D. Owings as principal, and Wm. Keeler and A. Lewis & Geo. E. Leberman as sureties, do hereby acknowledge ourselves indebted to R. O. Prideaux, of Archer county, Texas, in the sum of five thousand ($5,000) dollars, for the payment of which sum well and truly to be made we do hereby jointly and severally bind ourselves, our heirs, executors, and administrators, firmly by these presents.

"The condition of this obligation is such that if the said A. D. Owings shall fully and faithfully carry out and perform every covenant, undertaking, and obligation assumed by him in the written contract this day entered into between him and the said R. O. Prideaux in Archer county, Texas, more fully described in said contract, then this obligation is to become null and void, otherwise to remain in full force and effect.

"Witness our hands this 7th day of April, 1919. A. D. Owings,
"Principal.
"A. Lewis,
"William Keeler,
"Geo. E. Leberman,
"P. Edward Glenn,
"Sureties."

"Oil and Gas Lease.

"Made and entered into this 10th day of April, 1919, by and between R. O. Prideaux and his wife, Mrs. Sophia Prideaux, of the town of Farmer, Young county, Texas, parties of the first part, hereinafter called lessor, and H. O. Prideaux, party of the second part, hereinafter called lessee, witnesseth:

"That the lessor for and in consideration of the sinking of a well or wells on the thousand acres of land hereinafter described by A. D. Owings, of Bartlesville, Oklahoma, or his assigns, to a depth of seventeen hundred (1,700) feet, unless before reaching said depth oil in amounts of fifty (50) barrels per day shall be produced from said well, and in further consideration that the said A. D. Owings shall keep and perform each and every obligation fixed upon him by the terms of a written contract, dated April 4, 1919, executed by R. O. Prideaux and the said Owings, failure to do which shall avoid this contract, has granted, demised, leased, and let, and by these presents do grant, demise, lease, and let, unto the said lessee, for the sole and only purpose of mining and operating for oil and gas and of laying of pipe lines, and of building tanks, powers, stations, and structures thereon, to produce, save, and take care of said products, all that certain tract of land situated in the county of Archer, state of Texas, described as follows, to wit:

"554 acres of the north part of the Robert Crossman survey belonging to R. O. Prideaux, to be bounded on the south by a straight line running east and west.

"The William Hutton pre-emption survey, containing 50 acres. The west half of the Conrad Bollinger survey, containing 275 acres. 121 acres of the west part of the I. R. R. Co. survey No. 3, and containing 1,000 acres, more or less.

"It is agreed that this lease shall remain in force for a term of five years from this date, and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee.

"In consideration of the premises the said lessee covenants and agrees:

"1st. To deliver to the credit of lessor, free of cost, in the pipe line to which they may connect their wells, the equal one-eighth part of all oil produced and saved from the leased premises, and/or gas, whether from well where gas only is found or from oil well.

"2nd. And lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time by making his own connections with the well at his own risk and expense and for pumping purposes.

"3rd. To pay lessor for gas produced from any oil well and used off the premises at the rate of ——. If no well be commenced on said land on or before the first day of July, 1919, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, or to the lessor's credit in the Power State Bank, at Archer City, Texas, or its successors, which shall continue as the depository, regardless of changes in the ownership of the land, the sum of one thousand ($1,000) dollars, which shall operate as rental and cover the privilege of deferring the commencement of a well for twelve months from said date. In like manner, and upon like payments or tenders, the commencement of a

well may be further deferred for like periods of the same number of months successively. And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privilege granted to the date when said first rental is payable as aforesaid, but also the lessee's option of extending that period as aforesaid, and any and all other rights conferred.

"Should the first well drilled on the above-described land be a dry hole, then, and in that event, if a second well is not commenced on said land within twelve months from the expiration of the last rental period for which rental has been paid, this lease shall terminate as to both parties, unless the lessee, on or before the expiration of said twelve months, shall resume the payment of rentals in the same amount and in the same manner as hereinbefore provided. And it is agreed that upon the resumption of the payment of rentals, as above provided, that the last preceding paragraph hereof governing the payment of rentals, and the effect thereof, shall continue in force just as though there had been no interruption in the rental payments.

"If said lessor owns a less interest in the above-described land than the entire undivided fee-simple estate therein, then the royalties and rentals herein provided for shall be paid the lessor only in the proportion which his interest bears to the whole and undivided fee.

"Lessee shall have the right to use, free of cost, gas, oil, and water produced on said land for all operations thereon except water from wells of lessor.

"When requested by lessor, lessee shall bury their pipe lines below plow depth.

"No well shall be drilled nearer than 200 feet to the house or barn now on said premises without the written consent of lessor.

"Lessee shall pay for damages caused by all operations to growing crops on said land.

"Lessee shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing.

"If the estate of either party hereto is assigned—and the privilege of assigning in whole or in part is expressly allowed—the covenants hereof shall extend to their heirs, executors, administrators, successors, or assigns, but no change in the ownership of the land or assignment of rentals or royalties shall be binding on the lessee until after the lessee has been furnished with a written contract or assignment, or a true copy thereof; and it is hereby agreed that in the event this lease shall be assigned as to a part or as to parts of the above-described lands, and the assignee or assignees of such part or parts shall fail or make default in the payment of the proportionate part of the rentals due from him or them, such default shall not operate to defeat or affect this lease in so far as it covers a part or parts of said lands upon which the lessee, or any assigns thereof, shall make due payment of said rental.

"Lessor hereby warrants and agrees to defend the title to the lands herein described, and agrees that the lessee shall have the right at any time to redeem for lessor, by payment, any mortgages, taxes, or other liens on the above-described lands, in the event of default of payment by lessor, and be subrogated to the rights of the holder thereof.

"In testimony whereof we sign this the 11th day of April, 1919.

    "R. O. Prideaux.
    "Mrs. Sophia Prideaux."

On April 12, 1919, H. O. Prideaux transferred and assigned the lease to W. L. Mayes and W. G. Magoffin.

The instruments above set out and the assignment of the lease noted all appear in the trial judge's findings of fact, which findings recite further facts as follows:

"On, to wit, the 10th day of May, 1919, W. L. Mayes and M. W. Magoffin executed to A. D. Owings an assignment of the above lease on the following lands, to wit: 50 acres, being the William Hutton pre-emption survey. Also the west half of the Conrad Bollinger survey, containing 275 acres. Also 21 acres out of the N. W. part of I. R. R. Co. survey No. 3, described as follows: Beginning at the N. W. corner of the I. R. R. Co. survey No. 3; thence south along the west line of said survey 495 feet; thence east 1,848 feet to a point in the north line of said survey; thence west along the north line of said survey 1,848 feet to the point of beginning.

"On, to wit, the 4th day of June, 1919, A. D. Owings executed to R. L. Shrout an assignment of part of said oil and gas lease covering the following lands, to wit: A part of the S. W. corner of the Conrad Bollinger survey, abstract No. 8351, described as follows: Beginning at a point 495 feet north of the S. W. corner of the said Conrad Bollinger survey; thence north 1,320 feet; thence east 1,320 feet; thence south 1,320 feet; thence west 1,320 feet to the point of beginning, containing 40 acres.

"On May 10, 1919, W. L. Mayes and M. G. Magoffin executed to George E. Leberman, P. W. Adkins, and P. Edward Glenn an assignment of a part of the said oil and gas lease which covers the following property, to wit: 100 acres, beginning at the S. W. corner of the I. R. R. Co. survey No. 3; thence north along the west line of the said I. R. R. Co. survey No. 3 a distance of 2,359 feet, more or less, to a point 495 feet south of the N. W. corner of said survey; thence east 1,848 feet; thence south 2,359 feet, more or less, to a point in the south line of said survey; thence west along the south line of said survey 1,848 feet to the point of beginning.

"Thereafter, and on the 21st day of June, 1919, P. W. Adkins, joined by his wife, assigned to George E. Leberman his interest in 100 acres of land hereinabove described in the last preceding paragraph of these findings.

"On and before the 10th day of April, 1919, W. G. Magoffin, agent for A. D. Owings, selected 1,000 acres of land, which is described in the lease from R. O. Prideaux and his wife to H. O. Prideaux, and on said date the defendant A. D. Owings selected a location on the said 1,000 acres of land for the drilling of a well.

"Neither the defendant A. D. Owings, nor any of his agents, employees, or assigns, began the drilling of a well on the said 1,000 acres of land hereinabove mentioned, on or before

July 1, 1919, and neither the said Owings, nor any of his agents, employees, or assigns, or sureties on the bond above mentioned, paid to plaintiff the sum of five thousand ($5,000) dollars. as liquidated damages for such failure.

"Neither of the defendants have in any way complied with the provision (c) of paragraph (2) of the written contract dated April 4, 1919, hereinabove copied, and neither of said defendants have complied with paragraph (d) of said subdivision, and the defendant A. D. Owings, and the sureties on his bond above named, have breached the provisions of said paragraphs (c) and (d) of subdivision (2) of the said contract.

"On June 28, 1919, A. D. Owings deposited to the credit of R. O. Prideaux in the Power State Bank of Archer City, Texas, the sum of $750, and on June 30, 1919, the said A. D. Owings deposited to the credit of said Prideaux in said bank the sum of $250, and on said date the said bank, by written notice duly deposited in the Postoffice of Archer City, Texas, advised R. O. Prideaux thereof, but the said notice was not received by the said Prideaux until a later date. R. O. Prideaux has never appropriated the said credit, and has never returned same to Owings, nor tendered same to him, but the said credit still remains in the said bank in R. O. Prideaux's account."

Upon the facts so found the trial judge filed the following conclusions of law upon which he based his judgment:

### "Conclusions of Law.

"(1) The consideration for the execution of the oil and gas lease from R. O. Prideaux and his wife, Mrs. Sophia Prideaux, to H. O. Prideaux, was, among other things, the beginning of the drilling of an oil well on the lands described in said oil and gas lease on or before July 1, 1919, or, in the alternative, the payment to R. O. Prideaux of five thousand ($5,000) dollars for the failure to begin the drilling of such oil well.

"(2) The payment into the Power State Bank of Archer City, Texas, of one thousand ($1,000) dollars to the credit of R. O. Prideaux by the defendant A. D. Owings, prior to July 1, 1919, did not have the effect of relieving him from his covenants to begin the drilling of an oil well in the land in controversy prior to said date, or, in the alternative, to pay R. O. Prideaux five thousand ($5,000) dollars, but only had the effect of giving him the privilege of an extension of time for the beginning of the drilling of a well until July 1, 1920, and not to relieve him of his obligation to pay the $5,000.

"(3) Plaintiff is entitled to judgment against A. D. Owings as principal, and A. Lewis, William Keeler, George E. Leberman, and P. Edward Glenn as sureties, in the sum of $5,000, with interest thereon from July 1, 1919, to date, at six per cent. per annum.

"(4) Plaintiff is not entitled both to payment of the $5,000 and cancellation of the oil lease in controversy and the assignments thereof. Having found plaintiff entitled to judgment for $5,000, I conclude he is not entitled to the cancellation of said oil lease and the assignments thereof."

Plaintiff in error has presented only two assignments of error, which are submitted as propositions, and are as follows:

(1) "The court erred in his second conclusion of law, and the same is not supported by, but is contrary to his findings of fact, in this: The findings of fact show that the payment by defendant A. D. Owings, prior to July 1, 1919, of $1,000 to the credit of R. O. Prideaux, relieved defendants, plaintiffs in error, from the covenant to begin the drilling of an oil well on the land in controversy prior to that date, and from the duty to pay R. O. Prideaux $5,000."

(2) "The court erred in not entering judgment for these defendants upon the findings of fact made herein by the court."

The record contains no statement of facts, but we think it apparent from the findings filed by the trial court that the conclusion reached that plaintiff was entitled to recover on the bond was based solely upon the court's legal construction of the written instruments, set out above, unaided by any other evidence of the understanding of the parties as to the proper meaning of those instruments. Hence the proper legal construction of the contract, as evidenced by the three written instruments, is the only question to be determined.

The following excerpt from the opinion in the case of El Paso & S. W. Ry. Co. v. Eichel & Weikel, 130 S. W. 922, 935, which is cited in appellee's brief, seems to be a correct announcement of the proper rule of construction of contracts in writing:

"The prime object in construing a contract is to ascertain and give effect to the intention of the parties; for their intention, when ascertained, is the law by which their rights are determined. In order to ascertain their intention, the contract must be construed as an entirety, and all its features seen together, so as to perceive the intention expressed on its whole face. If the language used in expressing the intention be not so obviously clear as to leave no room for construction, the problem to be solved is not what the separate parts of the contract mean, but what it means when considered as a whole. Even though its separate parts may be clear and free from ambiguity, the same principle governing its construction obtains; for one part may affect the construction of a different part. But when several provisions are inserted the contract should, if possible, be so construed as to give effect to each provision, and in such way effect will be given to it as an entirety. Since it is to be construed as a whole, terms which can be clearly implied from the consideration of the entire instrument are as much a part of the contract as though plainly written on its face."

See, also, Wisdom v. Wilson, 59 Tex. Civ. App. 593, 127 S. W. 1128; Moore v. Waco, 85 Tex. 211, 20 S. W. 61.

[1] Viewing the three instruments as a whole, it plainly appears that in entering in-

to the contract the prime object of the lessor was to secure the drilling of a well in order to realize the profits from the oil and gas, if any should be found by such a test, and that the taking of the bond for the sum of $5,000 was for the purpose of insuring such a test; in other words, the primary purpose of the lessor was to realize profits from the oil, and secondarily to collect damages in the event the test should not be made by the lessee in accordance with his contract. That the particular date, July 1, 1919, fixed in paragraphs "c" and "d" of the original contract for beginning the well, ceased to be the essence of the drilling contract after the payment to lessor's agent, the Power State Bank, of $750 on June 28, 1919, and $250 on June 30, 1919, is plainly shown by the provisions of paragraph "a" of the same contract, in which it was expressly stated that by the payment of $1,000 on or before July 1, 1919, the time for beginning the well would be extended for 12 months from and after that date. If, after securing an extension of 12 months from July 1, 1919, within which to begin the well, by paying the stipulated rental of $1,000, a well had been begun after July 1, 1919, and within said period of extension, and had been drilled and finished within that period in accordance with all other requirements stipulated in paragraph "c" of the contract, clearly it could not be held that the lessor still could recover on the bond for failure to begin the well within the exact time stipulated in that paragraph. As, doubtless, that would be the legal construction of the contract in such a contingency no reason is perceived why the same construction should not obtain in the present suit. And in the absence of proper pleading and proof, if any could be made, which would warrant a different construction, it must be presumed that the parties placed the same construction on the contract, and intended and understood that such should be its legal meaning and effect.

The contract between the parties, construed as a whole, evidences, of course, an intention of the parties of the payment to the lessor of the amount of the bond as lessor's damages for the breach of the lessee's contract to drill a well. It also evidences an agreement that the well should be begun on or before July 1, 1919, and the payment of $5,000 as liquidated damages for failure to so begin drilling in the event of the lessee's failure to pay the stipulated rentals for an extension of the time for such beginning.

But it is apparent, further, that it was never contemplated that the lessee should have the right to an extension of the time of one year beyond July 1, 1919, within which to begin a well by paying $1,000 therefor, and at the same time be liable on the bond for $5,000 as damages for failure to begin the well on or before that date. Such a construction would be unreasonable and exceedingly harsh, and we cannot believe it was so understood and intended by the parties at the time the contract was executed.

Accordingly the judgment of the trial court in favor of R. O. Prideaux against defendants A. D. Owings and the sureties on the bond sued on is reversed, and judgment is here rendered that plaintiff take nothing of said defendants on that issue. The judgment denying plaintiff's suit for cancellation of the lease, from which no appeal was prosecuted, is undisturbed. But the judgment here rendered shall be without prejudice of plaintiff's right to sue on said bond for any breach of the drilling contract other than that alleged in plaintiff's petition in the present suit, and without prejudice to any right plaintiff may have for cancellation of the lease in controversy on grounds other than those alleged in this suit.

### On Motion for Rehearing.

[2] In our original opinion language was used indicating a holding that the lessee, H. O. Prideaux, entered into a binding contract to drill a well, and also assumed payment of the bond which Owings gave to insure the performance of such work. The use of such language was through inadvertence. The lease executed to H. O. Prideaux does not show any contract on his part either to drill a well or to assume payment of the bond for $5,000 theretofore executed by Owings. So far as the terms of the lease were concerned, the payment of rentals and the drilling of a well were both optional on the part of H. O. Prideaux. However, it is apparent, from a reading of both the contract and the lease, that the lease was taken in part at least for the benefit of Owings, if not entirely for his benefit, with H. O. Prideaux holding legal title thereto. At all events, so far as the liability of Owings and the sureties on the bond in suit is concerned, it makes no difference whether or not Owings had any interest in the lease, since the two instruments must necessarily be read in connection with each other.

The motion for rehearing is overruled.